**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHAEL BANKS MORGAN,

                Petitioner,

v.                                             Case Number: 07-CV-11231
                                             Honorable Victoria A. Roberts

BLAINE LAFLER,

                Respondent.

_____/

**OPINION AND ORDER DENYING PETITIONER'S**
**PETITION FOR WRIT OF HABEAS CORPUS**

      Petitioner Michael Banks Morgan is currently incarcerated at the Straits Correctional

Facility in Kincheloe, Michigan.[1]  Through counsel, he filed a "Petition for Writ of Habeas

Corpus" pursuant to 28 U.S.C. § 2254.  (Dkt. # 1.)  A jury found Petitioner guilty of (1) first-

degree (felony) murder, MICH. COMP. LAWS § 750.316(1)(b), (2) assault with intent to rob while

armed, MICH. COMP. LAWS § 750.89, and (3) conspiracy to assault with intent to rob while

armed, MICH. COMP. LAWS § 750.89.  For those conviction, the trial court sentenced Petitioner to

life imprisonment for the first-degree-murder conviction and terms of thirty-seven-and-one-half-

years- to one-hundred-years imprisonment for each of his assault and conspiracy convictions.  In

this Habeas Petition, Petitioner seeks relief from his convictions.  He alleges that (1) he has been

denied his right to confront the witnesses against him, (2) there was insufficient evidence to

convict him, (3) the trial court denied him his right to a fair trial by failing to correctly instruct

the jury on accessory after the fact liability, and (4) his due process rights were violated when

_____

      [1]Petitioner was incarcerated at the St. Louis Correctional Facility in St. Louis, Michigan,
when he initially filed his Habeas Petition.

the trial court failed to instruct the jury on the defense of imperfect self-defense. For the reasons discussed, the Court denies Petitioner's Petition.

I.

This case arises from the shooting death of Michael Connor which occurred during an attempted robbery on March 23, 2001. Petitioner was charged under a theory of aiding and abetting. He was not at the scene when the shooting occurred. His liability as a conspirator rested on the events preceding the crime and on the events in the aftermath of the crimes.

The prosecution presented evidence that Petitioner was a drug dealer who claimed that Connor, also a drug dealer, owed him a large sum of money. Jeremiah Brooks, a co-defendant in the case, testified that Petitioner, who was on a tether at the time of the incident, arranged for Eladio Nino and Patrick Bates, also co-defendants, to take money and drugs from Connor at his home. Because Brooks was working off a debt he owed Petitioner, he was enlisted as the lookout. Brooks testified that Petitioner assured him that the robbery would not be reported. Brooks also said that Petitioner was aware that one of the men was carrying a taser and that he [Petitioner] offered them a gun as well. According to Brooks, Petitioner instructed the men to wait until a Taurus, which was actually a Sable, left Connor's driveway before entering the residence.

Subsequently, at approximately 7:00 a.m., on March 23, 2001, Nino, Bates, and Brooks parked Nino's black SUV at the end of Connor's driveway. All three men were armed. Brooks testified that one of the weapons used by the men belonged to Petitioner. After the Sable left the driveway, Nino attempted to enter the front door while Bates and Brooks went to the side door. Finding the door locked, Brooks knocked. When Connor answered, Bates punched Connor in

2

the face and chased him into the house.  Bates struggled with Connor, hitting him on the head

with his gun while Connor fought back with a small baseball bat.  Ultimately, Bates shot Connor

in the head.  Bates and Brooks then ran back to the vehicle, followed by Connor's father and

brother who were awakened by the gunshot.  The men entered the SUV and drove off.

After parking the SUV at an apartment complex, burying their weapons in a field and

hiding behind a nearby party store, the men called Petitioner for a ride.  Because Petitioner could

not leave his home, he sent his girlfriend, Dina Kellums, to pick them up.  About two to four

weeks later, Petitioner accompanied the others to retrieve the buried weapons.  Upon Nino's

instruction, Brooks threw the shells and a bullet casing from the murder weapon over a bridge.

Subsequently, Petitioner destroyed the murder weapon.  Nineteen months passed before any of

the men were arrested for their roles in the attempted robbery and murder of Connor.

Within a day of the shooting, Connor died.

The facts surrounding the actual attempted robbery and murder and the subsequent

cover-up were not in dispute.

There were several pre-trial motions in this case but only a few are relevant in this

proceeding.  First, Petitioner filed a Motion to Quash based on an assertion that there was

insufficient evidence that he possessed the requisite intent necessary to support a bindover on the

felony-murder count.  The motion hearing was held on May 2, 2003.  The trial court ruled that

there was enough evidence at the preliminary examination to infer that there was a plan to

"commit a robbery and shoot the guy."  (Motion Hr'g Tr., 28, May 2, 2003.)

The second pre-trial issue of relevance is the hearsay testimony of Michael Donald

Broome, who allegedly reported a statement made by co-defendant Bates, implicating Bates,

3

Nino, Brooks, an unnamed individual, and Petitioner, in the planning and execution of the attempted robbery and murder of Connor. Defense counsel filed a "Motion to Exclude Hearsay" and the prosecution filed a "Motion to Permit the Admission" of that same hearsay under Mich.R.Evid. 804(b)(3). The motion hearing was held on June 3, 2003. The trial court subsequently issued an Opinion on June 9, 2003, granting the prosecution's motion, thereby allowing the use of the hearsay.

Trial in this case began on June 16, 2003. The testimony of two witnesses implicated the Petitioner in the planning of these crimes.

The first witness was Michael Donald Broome, the brother of the girlfriend of both co-defendant Nino and co-defendant Bates. Broome testified that Bates told him about the attempted robbery and homicide after they had occurred. Broome testified as follows:

> Q.   And what was that conversation about?
> A.   Well, Patrick Bates had told me how they went to go rob this kid and that things didn't turn out the way they expected and the kid ended up [] getting killed.
>
> * * *
>
> Q.   Tell us exactly or the best that you can recall what Mr. Bates tells you and who was involved?
> A.   He had told me that Michael Morgan had set it [the robbery] up to where him, one of his friends, well, Patrick Bates, Eladio Nino and one of Mr. Morgan's friends would go rob this kid. From there, they had went, the kid wouldn't give up the money or anything and Pat and the kid ended up struggling and the kid ended up getting shot.
>
> * * *
>
> Q.   He said Mr. Morgan set it up. Did he go into detail about how he set it up?
> A.   Yes, sir.
>
> Q.   How is that?

A.      That he was going to send his friend with Eladio Nino and Patrick Bates
         because he couldn't go with them because he was on house arrest
         or on tether.  So he sent his friend because he knew the house and I
         guess he knew the kid, sir.

Q.      And [] he [was] talking about [] Michael Morgan?

A.      Yes, sir.

* * *

(Trial Tr., 50-51, June 19, 2003.)

The second witness to implicate Petitioner in the planning of the robbery was co-defendant Jeremiah Brooks.  Brooks testified that, about a year after the incident, he was arrested and decided to cooperate with the prosecution.  At the request of the police, he said that he made a series of telephone calls to Petitioner, asking him to help him flee the state to avoid apprehension and prosecution in connection with the murder.  The telephone calls were monitored and taped.  The conversations suggested that Petitioner had knowledge of the crimes and showed that he was willing to give Brooks financial aid to flee.  Brooks testified as follows:

Q.      And did you plead guilty on that case?

A.      Yes.

* * *

Q.      Sir, you were involved in the killing of Michael Connor?

A.      I was present, yes.

Q.      Can you tell us how you who all else was involved?

A.      On the scene?

Q.      Yes.

A.      Mr. Morgan, Mr. Nino and Mr. Bates.

* * *

(Trial Tr., 172-78, June 19, 2003.)

Regarding Petitioner's involvement in the murder, Brooks further testified that he was

5

recruited by Petitioner the day before the robbery because he owed him some money and was

going to work it off.  Brooks said he met Bates and Nino, at Petitioner's home the day before the

incident.  He testified that there was a conversation about the robbery.  He also said that they had

a brief discussion about what would happen if they met with resistance; the understanding was

that a taser would be used if they had any problems.  According to Brooks, they met again

briefly, the following morning, at Petitioner's house before going to the Connor home.  Brooks

testified as follows:

> A.   He just told me that, you know, instead of working off that money in his yard and stuff that he needed somebody to be a lookout that I didn't have to participate just be a lookout while they took somebody's weed, marijuana and just to come over tomorrow the following day and we would discuss it.
> Q.   He told you to work off your debt he wanted you to got (sic) involved in something?
> A.   Correct.
> Q.   Did he tell you how big this was?
> A.   Yes.
> Q.   What did he say about this?
> A.   He said that someone owed him money that's what he initially said someone had owed him money.  It was around $40,000.  It had a lot of weight that's what said.

* * *

(Trial Tr., 179-80, June 19, 2003.)

> Q.   What did Mr. Morgan say in the conversation?
> A.   He just said that someone had ripped Bitzer off, the guy Bitzer, and there was a lot of money involved like $20,000 or $40,000 at the time.  That's what he said.  And that when it was done whenever they jacked the guy for the stuff that you know they ripped him off that Bitzer was going to get his cut.
> Q.   Did they ever get specific as to who they were talking about?
> A.   Connor.  That's all I heard.
> Q.   You heard the name Connor?
> A.   Connor.

6

* * *

> Q.     Besides [] the taser was there any other weapons mentioned?
> A.     Some guns.
> Q.     Who brought up the guns?
> A.     Mr. Morgan.

(Trial Tr., 182-89, June 19, 2003.)

On cross examination, the prosecutor impeached Brooks regarding his plea agreement with the prosecutor, his withdrawal and recantation of his plea to the charges and a second plea to the same charges, his prior convictions and admitted false statements and his early inculpatory statements to the police which made no mention of Petitioner.

During the nine-day trial, the prosecution presented a plethora of evidence regarding the robbery and the homicide, and there was no dispute between the prosecution and the defense over what had occurred during the commission of the offenses or who participated.

After the close of proofs and closing arguments by counsel, the trial court instructed the jury. The defense requested an instruction which would draw a distinction between the criminal liability of Petitioner as an aider and abettor and his lack of criminal liability for the charged offenses if the jury were to find that he was only an accessory after the fact. The trial court denied the request. After the necessary instructions were given, defense counsel indicated that he was satisfied with the instructions as given.

Following, the jury found Petitioner guilty as charged. On July 31, 2003, the trial court sentenced Petitioner as stated.

Subsequently, Petitioner, through counsel, filed an appeal as of right in the Michigan Court of Appeals, raising the following claims:

7

I.      As a matter of law, there was insufficient evidence of intent to support the [Petitioner's] conviction for felony murder when the homicide was outside of the scope of the common criminal plan and was the unforeseen and unanticipated result of an attempted robbery.

II.     The admission of the hearsay testimony of Mr. Broome, reporting the alleged statement of co-defendant Bates which tended to incriminate the [Petitioner], denied the [Petitioner] the right to confront the witnesses offered against him.

III.    The trial court erred in failing to instruct the jury that if they found that the [Petitioner] aided and abetted the perpetrators only after the commission of the crime, they must find the [Petitioner] not guilty.

IV.    The trial court erred in failing to instruct the jury on imperfect self-defense when that defense was well supported by the evidence and would have addressed an essential factor in the determination of whether [] felony-murder liability should attach.

The Michigan Court of Appeals affirmed Petitioner's convictions and sentences on March 15, 2005. *People v. Morgan*, No. 250437, 2005 WL 599714 (Mich.Ct.App. Mar. 15, 2005) (unpublished) (Cooper, J., dissenting).

Petitioner then filed an Application for Leave to Appeal from that decision in the Michigan Supreme Court, raising the same claims as raised in the Court of Appeals. The Michigan Supreme Court denied the Application on January 30, 2006. *People v. Morgan*, 474 Mich. 1024; 708 N.W.2d 401 (2006) (Cavanagh, J., would grant leave to appeal). Petitioner did not file a Writ of Certiorari with the United States Supreme Court.

Petitioner filed his "Petition for Writ of Habeas Corpus" [dkt. #1], on March 22, 2007, raising the following claims:

I.      The Petitioner's right to confrontation of the witnesses

against him as articulated in *Crawford v. Washington*, 541 U.S. 36 (2004) and *Lilly v. Virginia*, 527 U.S. 116 (1999) was violated by the admission of the co-defendant's statements against the accused.

II.    Petitioner was convicted on insufficient evidence as defined in *Jackson v. Virginia*, 443 U.S. (1979) where the State failed to demonstrate the existence of factors for first-degree murder as articulated by the Michigan Supreme Court in *People v. Aaron*, 409 Mich. 672, 727-29; 299 N.W.2d 304 (1980).

III.   The trial court violated [Petitioner's] right to a fair [trial] by giving confusing and materially incorrect instructions on accessory after the fact liability in violation of [Petitioner's] right to a fair trial. *United States v. Tarwater*, 308 F.3d 494 (6th Cir. 2002); *Taylor v. Withrow*, 288 F.3d 846 (6th Cir. 2002); *United States v. Newcomb*, 6 F.3d 1129 (6th Cir. 1993).

IV.    [Petitioner] also argues that his right to a fair trial was violated when the trial court did not instruct the jury on the defense of imperfect self-defense.

## II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA), altered the standard of review that federal courts must apply when reviewing a Petition for Writ of Habeas Corpus.  The AEDPA standard of review applies to all Habeas Petitions filed after April 24, 1996, the effective date of the Act.  28 U.S.C. § 2254(d) imposes the following standard:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal

9

law, as determined by the Supreme Court of the United
States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented
in the State court proceeding.

28 U.S.C. § 2254(d).

Under (d)(1), a federal court may grant a Writ of Habeas Corpus under two different
clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal
court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by
the Supreme Court on a question of law or if the state court decides a case differently than the
Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S.
362, 405-06 (2000); *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005).

An "unreasonable application" occurs when "a state[-]court decision unreasonably
applies the law of [the Supreme Court] to the facts of a prisoner's case." *Williams*, 529 U.S. at
407-08; *White*, 431 F.3d at 523. Relief is also available under this clause if the state-court
decision either unreasonably extends or unreasonably refuses to extend a legal principle from
Supreme Court precedent to a new context. *Williams*, 529 U.S. at 407; *Arnett v. Jackson*, 393
F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is
whether the state-court decision was "objectively unreasonable" and not simply erroneous or
incorrect. *Williams*, 529 U.S. at 409-11; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).
A federal-habeas court may not "issue the writ simply because that court concludes in its
independent judgment that the relevant state-court decision applied clearly established federal
law erroneously or incorrectly." *Williams*, 529 U.S. at 410-11.

In analyzing whether a state-court decision is contrary to or an unreasonable application

10

of clearly established Supreme Court precedent, a federal court may only look to the holdings, as

opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court

decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *but see Williams v. Coyle*, 260 F.3d 684,

699 & n. 8 (6th Cir. 2001) (noting mixed signals from Supreme Court and deciding that holdings

at time the petitioner's conviction became final shall control).  The Sixth Circuit recently stated:

> However, 'the lack of an explicit statement' of a particular rule by
> the Supreme Court 'is not determinative' of clearly established
> federal law, since '[t]he Court has made clear that its relevant
> precedents include not only bright-line rules but also the legal
> principles and standards flowing from precedent.

*Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005) (quoting *Taylor v. Withrow*, 288 F.3d

846, 852 (6th Cir. 2002)).  The court may not look to lower federal court decisions to formulate

the relevant rule of law but only to Supreme Court holdings. *James v. Brigano*, 470 F.3d 636,

643 (6th Cir. 2006).  However, it may look to lower courts of appeals' decisions to the extent

they interpret and explain those Supreme Court holdings to determine whether a legal principle

had been clearly established by the Supreme Court. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th

Cir. 2007).  The court is also bound by prior Sixth Circuit decisions concluding that federal law

on a particular issue has been clearly established by certain Supreme-Court holdings. *Smith v.

Stegall*, 385 F.3d 993, 998 (6th Cir. 2004).

Against that backdrop, the Court will proceed to address the merits of Petitioner's claim.

III.

A.

Petitioner argues that the introduction of statements made by Bates to Michael Broome at

trial, as proof of Petitioner's guilt, violated his rights under the Confrontation Clause and denied

11

him a fair trial.

The Confrontation Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Before *Crawford v. Washington*, 541 U.S. 36 (2004), Confrontation Clause challenges were analyzed under the test described in *Ohio v. Roberts*, 448 U.S. 56 (1980).  Under that test, the admission of hearsay statements by unavailable declarants did not violate the Confrontation Clause if they bore "adequate indicia of reliability," either by falling within a firmly rooted hearsay exception, or by possessing "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statement's reliability.  *Roberts*, 448 U.S. at 66.  The indicia of reliability were to be determined by virtue of the inherent trustworthiness of the statement itself, focusing on the circumstances surrounding the making of the statement, and not by reference to other evidence at trial.  *Idaho v. Wright*, 497 U.S. 805, 822 (1990).

The Supreme Court has now explicitly held that the Confrontation Clause is not implicated by the introduction of non-testimonial hearsay.  In *Davis v. Washington*, 547 U.S. 813, 823 (2006), the Supreme Court addressed the question of "whether the Confrontation Clause applies only to testimonial hearsay," and in doing so abrogated *Roberts* altogether.  *Id.* The *Davis* Court noted that the answer to that question was suggested in *Crawford* itself, when the *Crawford* decision explained that the Confrontation Clause focused on witnesses who gave testimony.  It stated:

> The text of the Confrontation Clause reflects this focus [on testimonial hearsay].  It applies to 'witnesses' against the accused-in other words, those who 'bear testimony.'  1 N. Webster, An American Dictionary of the English Language (1828).  'Testimony,' in turn, is typically 'a solemn declaration or

12

affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An
accuser who makes a formal statement to government officers bears testimony in
a sense that a person who makes a casual remark to an acquaintance does not.
541 U.S., at 51, 124 S.Ct. 1354.

*Davis*, 547 U.S. at 823-34. The *Davis* Court explained that "[a] limitation so clearly reflected in

the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but

its perimeter." *Id.* at 824. Thus, where non-testimonial hearsay is at issue, the Confrontation

Clause is not implicated, and need not be considered. *See Whorton v. Bockting*, 549 U.S. 406,

420 (2007) ("Under *Roberts*, an out-of-court non[-]testimonial statement not subject to prior

cross-examination could not be admitted without a judicial determination regarding reliability.

Under *Crawford*, on the other hand, the Confrontation Clause has no application to such

statements and therefore permits their admission even if they lack indicia of reliability.")

    Habeas review is conducted in light of the law as it existed at the time of the final state

court decision. *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004). Stated otherwise, "[t]he

threshold question under AEDPA is whether [Petitioner] seeks to apply a rule of law that was

clearly established at the time his state-court conviction became final." *Williams*, 529 U.S. 362,

390 (2000). *See also Onifer v. Tyszkiewicz*, 255 F.3d 313, 317-318 (6th Cir. 2001) ("Under

AEDPA . . . our inquiry is limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time []

conviction became final."); *Fulcher v. Motley*, 444 F.3d 791, 815 (6th Cir. 2006) ("Respondent

does not dispute that had *Crawford* come out prior to the final disposition of [] case on direct

review, the Court's holding would have applied to [] case.") (Clay, J., concurring).

    Petitioner's convictions became final when leave to appeal was denied by the Michigan

Supreme Court. *Crawford* was the law at that time.

In *Crawford*, the defendant challenged the admission at trial of a statement by the defendant's wife made to the police in a custodial setting, shortly after the crime occurred, a statement which tended to inculpate the wife.  She did not testify at trial because of Washington's marital privilege.  The Washington Supreme Court upheld the conviction and the admissibility of the statement under the *Roberts* indicia of reliability test.  On direct appeal, the United States Supreme Court reversed and overturned the "indicia of reliability" approach of *Roberts*.  The Court concluded that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional concerns is the one the Constitution actually prescribes: confrontation."  *Crawford*, 541 U.S. at 68-69.

> Where testimonial evidence is at issue . . . the Sixth Amendment demands what
> the common law required: unavailability and a prior opportunity for
> cross-examination.  We leave for another day any effort to spell out a
> comprehensive definition of "testimonial."  Whatever else the term covers, it
> applies at a minimum to prior testimony at a preliminary hearing, before a grand
> jury, or at a former trial; and to police interrogations.  These are the modern
> practices with closest kinship to the abuses at which the Confrontation Clause was
> directed.

*Crawford*, 541 U.S. at 68 (footnote omitted).

In the case at bar, the admission of the statement made by Bates to Broome was non-testimonial in nature, and thus, there is no arguable violation of the Confrontation Clause.  Petitioner is therefore not entitled to habeas relief on this claim.

### B.

In Petitioner's second claim, he contends that there was insufficient evidence to support his conviction of first-degree murder, because the prosecutor failed to demonstrate the requisite

2:07-cv-11231-VAR-VMM   Doc # 8   Filed 07/08/09   Pg 15 of 20   Pg ID 1918

mental state.

A claim that the evidence was insufficient to convict a petitioner is cognizable under 28 U.S.C. § 2254.  Because the Due Process Clause "forbids a State to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt," *Fiore v. White*, 531 U.S. 225, 228-29 (2001), "a state[-]law question regarding the elements of the crime predicates the enforcement of [Petitioner's] federal constitutional right."  *Richey v. Mitchell*, 395 F.3d 660, 672 (6th Cir. 2005).

Sufficient evidence supports a conviction if, after viewing the evidence (and all inferences to be drawn therefrom) in a light most favorable to the prosecution, the court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *cert. denied*, 540 U.S. 1148 (2004).  This standard of review obviously does not permit the federal court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts.  *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *McKenzie*, 326 F.3d at 727.

This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime and not to the state's burden to prove the absence of an affirmative defense; however, if the state has made the absence of a defense an element of the crime, sufficiency of evidence on the issue will then be relevant.  *Allen v. Redman*, 858 F.2d 1194, 1196-98 (6th Cir. 1988).  Circumstantial evidence may support a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.  *Clifford v. Chandler*,

15

333 F.3d 724, 728 (6th Cir. 2003), *cert. denied*, 124 S.Ct. 1601 (2004).

Regarding this claim, the Michigan Court of Appeals, the last court to issue a reasoned

decision, stated:

> Contrary to defendant's argument, there was sufficient evidence to sustain defendant's convictions of felony murder on an aiding and abetting theory. The requisite intent for a conviction as an aider and abettor is that necessary to be convicted as a principal. *People v. Mass*, 464 Mich. 615, 628; 628 NW2d 540 (2001). The prosecution must show the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, I .e., malice. *People v. Carines*, 460 Mich. 750, 758; 597 NW2d 130 (1999). An aider and abettor's state of mind may be inferred from all the facts and circumstances, including a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime. *Id.* at 757-758. A defendant's knowledge that an accomplice was armed during the commission of an armed robbery is sufficient for an inference of malice. *People v. Turner*, 213 Mich.App 558, 567, 572-573; 540 NW2d 728 (1995), *overruled in part on other grounds Mass*, *supra* at 627-628.

> There was ample evidence of defendant's involvement in the events leading to the shooting as well as the cover-up. The prosecution presented evidence that defendant planned and organized a robbery in which three men, armed with guns, confronted Connor at his home to steal money and drugs from him. According to Brooks' testimony, during the planning, defendant indicated that he had a gun that could be used if needed and Brooks recognized one of the guns used in the robbery as one defendant had "showed off" a year earlier at his home. The jury could infer that defendant knew that the men would be armed and that he supplied at least one of the guns. There was also evidence that defendant participated in the cover-up after the shooting, including grinding up the murder weapon on a grinder in defendant's garage. The evidence was sufficient to establish that defendant intentionally set in motion a force likely to cause death or great bodily harm and, therefore, had the requisite malice to be convicted of felony murder. *Carines*, *supra* at 759-760; *Turner*, *supra* at 572-573.

*Morgan*, 2005 WL 599714 at 2.

This Court finds that the state appellate court's determination is not contrary to, or an

unreasonable application of, clearly established Supreme Court precedent. Brooks testified that

he owed Petitioner money for drugs and that Petitioner asked him to work it off by serving as a

16

lookout.  According to Brooks, he went to Petitioner's home the day before the murder and told

him that he did not want to be involved.  At that time, Petitioner introduced Brooks to Nino and

Bates, and they discussed "the plan they had to take some drugs from Mr. Connor and some

money."  (Trial Tr., 185-187, June 19, 2003.)

Brooks further testified that the next day, he met Bates and Nino at Petitioner's home.

Brooks then described the events, as stated above, that led to the murder of Connor.

Based on the evidence presented, a jury could infer that Petitioner, Bates, Nino, and

Brooks planned the robbery, and that Petitioner supplied one of the guns used by Bates and

Brooks during the incident.  Petitioner did not merely encourage his accomplices, rather, he was

the mastermind behind the robbery.  Apparently the jury believed that all the men agreed to rob

Connor, had discussed the weapons that could be used to commit the crime, and undoubtedly

knew that they would have to use force to take a rival drug dealer's property.  This Court finds

that the evidence against Petitioner was overwhelming, and concludes that the Michigan Court of

Appeals' decision did not involve an objectively unreasonable application of clearly established

Supreme Court law.  Petitioner is not entitled to habeas relief regarding this claim.

## C.

Regarding Petitioner's third and fourth claims, the Court finds that these claims are

barred by procedural default.  In his third claim, Petitioner contends that his trial was unfair

because the trial court gave confusing and materially incorrect instructions on accessory after the

fact liability.  His fourth claim also alleges that his right to a fair trial was violated because the

trial court failed to instruct the jury on the defense of imperfect self-defense.  None of these

alleged errors was objected to at trial, and therefore, the Michigan Court of Appeals' review was

17

limited to a plain error inquiry, which constitutes a procedural default.  Thus, this Court may only review those issues if Petitioner demonstrates cause and prejudice.

The doctrine of procedural default provides: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Application of the cause-and-prejudice bar may be avoided if a petitioner "presents an extraordinary case whereby a constitutional violation resulted in the conviction of one who is actually innocent."  *Rust v. Zent*, 17 F.3d 155, 162 (6th Cir. 1994).

For the doctrine of procedural default to apply, a firmly established state procedural rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that state procedural rule.  *Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001).  Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 729-30.  Finally, the state procedural rule must amount to an "adequate and independent" state law ground.  *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005). Whether the independent state ground is adequate to support the judgment is itself a federal question.  *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

The last state court to issue a reasoned opinion on this claim, the Michigan Court of Appeals, held that these claims were not preserved because counsel failed to lodge a timely

18

objection.  *Morgan*, 2005 WL 599714 at 5-6.  Petitioner does not assert that his trial counsel was ineffective as cause to excuse his procedural default.  Because the petitioner failed to demonstrate cause to excuse his procedural default, this Court may not review the claims unless he can establish a constitutional error resulting in a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995).

The Supreme Court has held that application of the "miscarriage of justice" exception to the procedural default rule should apply only to cases where there is a likelihood of convicting a person who is actually innocent.  *Schlup*, 513 U.S. at 321.  " '[A]ctual innocence' means factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 623 (1998).  "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup*, 513 U.S. at 324.  Petitioner has not done so here.  In fact, Petitioner has pointed to no new evidence that the jury was not given.  Therefore, his procedural default will not be excused on this ground.

Moreover, even if these claims were not procedurally barred, they fail to state claims upon which relief may be granted.  In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  If an instruction is ambiguous and not necessarily erroneous, it runs afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a

way that violates the Constitution. *Id.* at 72. State law instructional errors rarely form the basis

for federal habeas corpus relief. *Id.* at 71-72.

Against that backdrop, Petitioner is not entitled to habeas relief regarding these claims.

IV.

The Court **DENIES WITH PREJUDICE** Petitioner's "Petitioner for Writ of Habeas

Corpus" [dkt. # 1].

**IT IS SO ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  July 8, 2009

| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on July 8, 2009. |
|---|
| s/Linda Vertriest |
| Deputy Clerk |

20